1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                   **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    WENDY EDWARDS,                          CASE NO. CV-F-04-5407-LJO

12              Plaintiff,                    **MEMORANDUM DECISION AND ORDER
                                              ON PLAINTIFF'S APPEAL FROM**
13                                            **ADMINISTRATIVE DECISION (Doc. 13)**

14        vs.

15    _____
      JO ANNE BARNART,
16    Commissioner of Social Security,

17              Defendant.
      _____/

18        Plaintiff Wendy Edwards ("claimant") seeks judicial review of an administrative decision

19    denying her claim for disability benefits under the Social Security Act, Title XVI ("Act").  Pursuant to

20    28 U.S.C. § 636(c) and Fed.R.Civ.P. 73, the parties consented to proceed before a United States

21    Magistrate Judge, and by a July 23, 2004 order, this action was assigned to United States Magistrate

22    Judge Lawrence J. O'Neill for all further proceedings.  Pending before the Court is claimant's appeal

23    from the administrative decision of the Commissioner of Social Security ("Commissioner").

24        Claimant filed her complaint on March 9, 2004 and her opening brief on October 22, 2004.[1]  The

25    Commissioner filed her opposition to the appeal on November 29, 2004. Claimant filed her reply brief

26    on December 14, 2004.

27    _____

28        [1] Counsel is cautioned that future briefing with this Court should include pagination on all pages.

## BACKGROUND

### Administrative Proceedings

On June 30, 2000, claimant applied for disability and disability insurance benefits under Title XVI of the Act alleging disability onset of December 27, 1996 due to a learning disability, stroke, back and knee problems, migraine headaches, dizziness, blurred vision, weakness, hurt murmur and irregular heartbeat.   (Administrative Record ("AR") 95, 101.)   Her claim was denied initially and upon reconsideration.  Claimant's application was further denied by an Administrative Law Judge ("ALJ") in a decision issued on February 11, 2003. (AR 23-30.)  On January 13, 2004, the Appeals Council denied review.  (AR 11-156.) The Appeals Council then received additional evidence for review from claimant. (AR 10.)  On March 31, 2004, the Appeals Council set aside its decision of January 13, 2004 and considered the additional new material (AR 6-9.)  Nonetheless, after considering the additional information, the Appeals Council did not find any reason to review the ALJ's decision and denied the request for review.  (AR 6.) Claimant filed this action for judicial review pursuant to 42 U.S.C. § 405(g).

### Claimant's Background and Work Experience

Claimant was born on January 4, 1968.  (AR 95.)  She completed the eleventh grade and has had no further education.  (AR 36-37.)  She can read and write the English language.  (AR 36.)

### Medical History

The pertinent medical history is summarized as follows.

A computed tomography scan of claimant's brain on March 30, 1998 showed normal brain density, no hemorrhage or infarct and no mass or midline shift.  (AR 148.)

An MRI of claimant's left knee on October 20, 1999 showed joint effusion, partial tear of the anterior cruciate ligament, tear of the posterior horn of the medial meniscus, and cystic change near the capsular margin of the lateral meniscus.  (AR 160.)

On October 22, 2000, claimant was evaluated by David Thomas Jones, M.D., internal medicine. (AR 168-170.)  Claimant reported that she had a slight stroke in 1997 and reported left sided weakness. She reported low back pain since a car accident.  Dr. Jones found stroke dubious and not evident, found low back pain and reported knee surgery was scheduled.  (AR 169.)

On October 24, 2000, Robert Caton, M.D., an orthopedist, performed arthroscopy of the left

2

1  knee.  (AR 175.)

2      In a psychological assessment report on October 26, 2000, by Jennifer Kirkland, Ph.D., a licensed

3  psychologist, claimant reported having a stroke and problems with her memory.  (AR 177.)  Claimant

4  also admitted to "having a fairly extensive methamphetamine use history."  She reported being clean for

5  1 year and 2.5 months.  (AR 177.)  Claimant reported attempts at rehabilitation through 3 meetings a

6  week.  Claimant reported daily activities of driving, taking a bus, shopping for groceries, preparing

7  meals, laundry, house and yard work.  (AR 178.)  She reported that she can bathe herself, read, watch

8  TV, visit with friends and exercise.  Mental status on interview was pressured and rapid speech,

9  somewhat tangential and anxious.  In answering questions, claimant was impulsive and easily agitated

10  and somewhat confused with directions.  (AR 178.)  Dr. Kirkland administered tests.  (AR 178.)

11  Claimant's verbal IQ test was at 70, her performance IQ at 74, and her full scale IQ at 69.  (AR 181.)

12  Dr. Kirkland reported that based on the single session, it would be difficult to infer claimant's day to day

13  functional capacity.  Nonetheless, Dr. Kirkland assessed claimant as able to understand, carry out and

14  remember simple instructions, to respond appropriately to co-workers, supervisors and the public and

15  more than like able to respond appropriately to usual work situations. (AR 179.) Dr. Kirkland described

16  claimant's conduct at the interview as either one of two possibilities: either claimant was continuing to

17  use methamphetamine (which claimant denied) or in the past, claimant used the drug as self medication

18  for attention deficit/hyperactivity disorder.  (AR 180.)

19      In a Physical Residual Functional Capacity Assessment form by Thien Nguyen, M.D. on

20  November 17, 2000, claimant was assessed with ability to lift and/or carry 20 pounds occasionally and

21  10 pounds frequently, stand and/or walk at least 2 hours in and 8-hour workday and sit about 6 hours

22  in an 8-hour workday.  (AR 183.)  She was assessed with the ability to only occasionally climb, kneel,

23  crouch and crawl.  (AR 183-184.)

24      In a  Mental Residual Functional Capacity Assessment form by Segundina Yancha, M.D. on

25  November 20, 2000, claimant was assessed as not significantly limited, except moderately limited in

26  ability to understand, remember and carry out detailed instructions, maintain attention and concentration

27  for extended periods and ability to work in coordination with others.  (AR 190.)  She was also

28  moderately limited in ability to interact with the public, get along with co-workers and adapt to changes.

1  (AR 191.)

2  Claimant and her daughter attended family counseling periodically from August 2000 to

3  November 2000.  (AR 210.)   On December 18, 2002, Debra Jahnon, Ph.D., a licensed clinical

4  psychologist, wrote a letter reporting that claimant attended group regularly, interacts with the group,

5  and has improved her self esteem.   (AR 207.)   She attended an intensive outpatient programs for

6  substance abuse.  (AR 213.)

7  Claimant was periodically seen for continued knee pain in 2001.  (AR 226, 228.)

8  Claimant first saw her treating physician, Brij Gupta, M.D., on March 26, 1998 (AR 258.)  She

9  complained of left sided weakness, blurred vision, numbness, tingling on the left side.  She reported

10  being on methamphetamine, but was clean for 3-4 months.  (AR 258.)  She reported no history of

11  headaches. (AR 258.) On September 28, 2000, Brij Gupta, M.D., claimant's treating physician prepared

12  a Medical Report.  In the one page report he checked that claimant had a permanent incapacity that

13  prevents work, due to stroke, head trauma and knee pain.  (AR 242.)[2]  Dr. Gupta's notes indicate he had

14  seen claimant for knee pain and migraines.  (AR 250.)

15  On August 21, 2001, a second operation was performed to repair her left knee after she reinjured

16  it while running with a baby she was babysitting.  (AR 293-294, 298.)  On October 17, 2001 claimant

17  again reported problems with her knee.  Robert Caton, M.D. explained that she will have long term

18  problems with the knee and it will not function normally.  (AR 299.)  In January 22, 2002, claimant's

19  therapy was discontinued, she was showing normal functional range of motion, good functional mobility

20  and she was given home exercise stretching program.  (AR 348.)

21  On August 17, 2001, claimant was seen at the neurology clinic for a consultation on referral by

22  her primary physician Dr. Gupta for left sided weakness.  (AR 316.)   Claimant was evaluated by

23  Yewondwossen Kassa, M.D., and Alan Schaffert, M.D. to rule our stroke, cerebral vascular accident or

24  transient ischemic attack.  (Ar 316-317.)  Claimant was referred for a CT scan of her head on August

25  30, 2001, which was normal.  (AR 310.)  Claimant also had a Carotid Doppler study (which uses

26  ultrasound to evaluate possible blockages or narrowing of vessels) on August 30, 2001, which was

27

28

[2] Some of Dr. Gupta's notes relate to a different patient and were not considered by the Court.

4

normal.  (AR 311, 314.)  Claimant was referred for an electroencephalogram by Dr. Schaffert, M.D., on September 20, 2001, which was normal.  (AR 308.)

On January 17, 2002, Dr. Kassa completed a questionnaire opining that claimant could sit 6 hours, stand/walk one hour and lie down or elevate her legs on hour per day due to decreased muscle strength in her left upper and lower extremity, left knee osteoarthritis, and weakness in her left hand. (AR 285-286.)

On August 11, 2003, claimant was seen for her left knee with complaints it has been buckling. (AR 374.)  On September 11, 2003, an MRI of the left knew showed degenerative change with narrowing of the medial compartment of the joint space and erosion of the medial meniscus.  (AR 372.) She had further surgery on the knee on October 28, 2003.  (AR 366.)

### Hearing Testimony

Claimant testified that she stopped work in October 1999 because of pain in her back, right ankle and left knee.  (AR 37.)  She was last an in home care provider, where she assisted the person in cleaning, running errands, cooking.  (AR 38.)  She was a store clerk who stocked, did the registers and helped customers.  (AR 39.)  She injured her knee in December 1996, which is when she became disabled.  (AR 42.)  She makes meals four times a day and washes dishes five times a day.  (AR 43.) She mops the floors eight times a month and sweeps every day.  (AR 43.)  She does laundry once a week and changes the sheets once a week.  (AR 43.)  She grocery shops once a week.  (AR 44.)  She watches 4 hours of television a day and spends a couple of hours a day reading.  (AR 44.)  She visits people three times a week.  She sleeps about 12 hours in a 24-hour day.  (AR 47.)  Her doctor has told her not to work.  (AR 47-48.)  She is not currently seeing any mental health practitioner.  (AR 48.)  She testifies she can stand for 20 minutes, sit for 30 minutes and walk fifty to sixty yards.  (AR 49.)  She has problems hearing but has not been prescribed a hearing device.  (AR 51.)  She has pain in her left side, her left knee, head and back, and the pain is achy, stabbing, tingling and dull.  (AR 51-52.)  The pain is continuous throughout the day.  (AR 52.)  Medications help.  She is partially paralyzed on the left side. (AR 53.)  She takes medication to relieve her pain and hot and cold packs.  (AR 56.)  She gets an upset stomach and nausea from the medication.  (AR 57.)  She uses a cane a couple of times a week.  (AR 56.)

Vocational Expert ("VE") Guy Deaner testified.  (AR 57.)  The VE testified that the past work

as a store clerk is medium exertion and unskilled.  (AR 58.)  The VE was given the hypothetical of a person with light residual functional capacity, 35 years of age, limited education and can lift, push, pull 20 pounds occasionally and 10 pounds frequently and walk, stand frequently and sit stoop or bend occasionally.  (AR 58.)  The VE testified that claimant could not perform her past relevant work but could perform a cashier job of which there are 159,000 in California, fast food worker of 47,000 in California, and a cafeteria attendant of which there are 14,000 in California.

The ALJ modified the hypothetical to unlimited in attention, concentration, understanding and memory, unlimited vision and hearing, limited in overhead reach with left non-dominate hand, intact fine finger manipulation and limited gross manipulation with left non-dominate hand and slight to moderate pain. The VE testified that there would be 10 percent erosion of the occupational base. (AR 59.)  In a variation of this hypothetical, the VE was asked to assume that claimant had a moderate to severe pain level and moderately limited in the ability to do simple routine repetitive tasks.  (AR 59.)  In that hypothetical, the VE testified there would be a 75% erosion of the occupational base.  (AR 59.)

In the next hypothetical, the VE was asked to assume a sedentary residual functional capacity and she can lift, push, pull 10 pounds occasionally and 5 frequently, walk, stand, stoop and bend occasionally and sit frequently.  The VE testified that claimant could not perform her past relevant work, but could perform as an assembler of small parts, of which there are 48,000 in California, as a hand packager, of which there are 400 in California and as a surveillance system monitor of which there are 15,000 in California.  (AR 60.)

In the next hypothetical, claimant was unlimited in attention, concentration, understanding and memory, and in hearing and vision but slightly limited in overhead reach and gross manipulation with the left non-dominate hand, slightly limited in routine repetitive tasks.  (AR 60.)  The VE testified that there would be 10 percent erosion of the occupational base.  (AR 60.)  In a modification of this hypothetical, the VE was asked to assume a slight limitation in attention, concentration, understanding and memory and moderate limitation in gross manipulation with the non-dominate hand.  (AR 60.)  The VE tested that there would be a 20 percent erosion on the assembly and hand packager jobs and a 10 percent erosion on the surveillance system monitoring job.  In a final modification of the hypothetical, the VE was asked to assume claimant had a moderate to severe pain level and moderate limitation in the

ability to do simple routine repetitive tasks.  (AR 61.)  The VE testified that there would be a 75 percent erosion of the occupational base.  The VE testified that there would be an erosion of the occupational base if a person had trouble dealing with instructions, became agitated or had trouble dealing with changes in routine.  (AR 66-68.)

## ALJ Findings

In his February 11, 2003 decision, the ALJ characterized the "primary issue" before him as whether claimant was disabled.  (AR 23.)  In determining claimant was not disabled and not eligible for benefits, the ALJ made the following findings (AR 29):

1.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2.  The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR §416.920(b).

3.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, and Regulation No. 4.

4.  The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

5.  The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments.  20 CFR §416.927.

6.  The claimant has the following residual functional capacity: She is limited to primarily sitting with occasional standing and walking, lifting and carrying up to 10 pounds, moderately limited in left hand manipulation, and is slightly limited in attention, concentration, understanding and remembering.

7.  The claimant is unable to perform any of her past relevant work.  20 CFR §416.965.

8.  The claimant is a "younger individual."  20 CFR §416.963.

9.  The claimant has a "limited education."  20 CFR 416.964.

10. The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case.  20 CFR §416.968.

11. The claimant has the residual functional capacity to perform a significant range of

1    sedentary work.  20 CFR §416.967.

2    12.    Although the claimant's exertional limitations do not allow her to perform the full range

3           of sedentary work, using Medical-Vocational Rule as a framework for decision-making,

4           there are a significant number of jobs in the national economy that she could perform.

5           Examples of such jobs would include unskilled, sedentary jobs, including assembly, of

6           which there are 48,000 jobs in the U.S. economy; hand packer, of which there are 400

7           jobs in the U.S., and surveillance system monitor, of which there are 15,000 jobs.

8           Assuming a light to moderate pain, the expert opined there would a 20% erosion of the

9           assembly and hand packer jobs and a 10% erosion of the surveillance system jobs.  This

10          constitutes a significant number of jobs.

11   13.    The claimant was not under a "disability," as defined in the Social Security Act, at any

12          time through the date of this decision.  20 CFR §416.920(f).

### DISCUSSION

#### Standard of Review

15   Congress has provided a limited scope of judicial review of a Commissioner's decision.  *See* 42

16   U.S.C. § 405(g).  A court must uphold the Commissioner's decision, made through an ALJ, when the

17   determination is not based on legal error and is supported by substantial evidence.  *See Jones v. Heckler*,

18   760 F.2d 993, 995 (9th Cir. 1985); *Sanchez v. Secretary of Health & Human Services*, 812 F.2d 509, 510

19   (9th Cir. 1987) (two consulting physicians found applicant could perform light work contrary to treating

20   physician's findings).  Substantial evidence is "more than a mere scintilla" (*Richardson v. Perales*, 402

21   U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119,

22   n. 10 (9th Cir. 1975).  Substantial evidence "means such evidence as a reasonable mind might accept as

23   adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.

24   The record as a whole must be considered, weighing both the evidence that supports and detracts

25   from the Commissioner's conclusion.  *Jones,* 760 F.2d at 995.  If there is substantial evidence to support

26   the administrative findings, or if there is conflicting evidence that will support a finding of either

27   disability or nondisability, the finding of the Commissioner is conclusive.  *Sprague v. Bowen*, 812 F.2d

28   1226, 1229-1230 (9th Cir. 1987).

1    Thus, this Court reviews the Commissioner's decision pursuant to 42 U.S.C. § 405(g) to

2    determine whether it is:  (1) based on proper legal standards; and (2) supported by substantial evidence

3    in the record as a whole.  *Copeland v. Bowen*, 861 F.2d 536, 538 (9th Cir. 1988).

4    Claimant contends that the ALJ is biased.  Claimant also contends that the ALJ erred by (1)

5    failing to properly consider and develop the record on her mental condition, (2) found claimant capable

6    of sedentary work, and (3) improperly evaluating her credibility.

7    **Additional Evidence Submitted to the Court**

8    Claimant attached to her opening brief, among other things, a comprehensive psychological

9    evaluation by Robert Morgan, Ph.D, clinical psychologist, dated March 27, 2004.

10   The court has jurisdiction to remand matters on appeal for consideration of newly discovered

11   evidence.  *See Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985); 42 U.S.C. § 405(g).  Section 405(g)

12   expressly provides for remand where new evidence is material and there is good cause for the failure to

13   incorporate the evidence in a prior proceeding.  *See Burton v. Heckler*, 724 F.2d 1415, 1417 (9th

14   Cir.1984). To meet the materiality requirement, the new evidence must bear directly and substantially

15   on the matter.  *Id.*  If new information surfaces after the Commissioner's final decision and the claimant

16   could not have obtained that evidence at the time of the administrative proceeding, the good cause

17   requirement is satisfied.  *See Booz v. Secretary of Health and Human Services*, 734 F.2d 1378, 1380 (9th

18   Cir.1984).  At a minimum, such evidence must be probative of mental or physical impairment.  *Hall v.*

19   *Secretary of Health and Human Services*, 602 F.2d 1372, 1377 (9th Cir.1979).

20   In *Key,* the court refused to consider a new medical opinion solicited after the adverse

21   adminstrative decision.  "Key, however, offers no reason why he had not solicited this information from

22   Dr. Jacobs earlier. Nor does Key tell us why he did not ask the district court to consider the evidence.

23   The obvious explanation is that when Key failed to succeed on his disability claim in the agency and

24   district court hearings, he sought out a new expert witness who might better support his position. The

25   'good cause' requirement would 'be meaningless if such circumstances were sufficient to allow

26   introduction of new evidence.'"  *Key v. Heckler*, 754 F.2d at 1551 (emphasis added.)  Since good cause

27   was not shown, the court refused to remand for consideration of the new evidence.

28   Likewise, here, the March 27, 2004 opinion by Robert Morgan, Ph.D, was obtained after the

9

adverse administrative decision.  Like *Key*, the opinion was obtained post adverse decision by the ALJ on February 11, 2003 and post decision by the Appeals Council.  (AR 6-10, 11-13.)  Indeed, the Appeals Council considered additional evidence submitted by the claimant, although Dr. Morgan's report was not submitted to the Appeals Council.  (AR 6-10.)  Nonetheless, like the report in *Key*, good cause is not shown.  Therefore, the Court will not consider the opinion.

### The Sequential Evaluation

In order to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must show that she has a physical or mental impairment of such severity that she is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).  The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

To achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation to determine whether a claimant is physically or mentally disabled.  20 C.F.R. §§ 404.1520 (a)-(f) and 416.920(a)-(f).  If during any point of this review, it is determined that the claimant is not disabled, the claim is not to be considered further.  20 C.F.R. §§ 404.1520(a) and 416.920(a).  The five-step process is summarized as follows:

> 1.   Determination of whether the claimant is engaged in substantial gainful activity, and if so engaged, the claimant is not presumed disabled and the analysis ends;
>
> 2.   If not engaged in substantial gainful activity, determination of whether the claimant has a severe impairment; if the claimant does not, the claimant is not presumed disabled and the analysis ends;
>
> 3.   If the claimant has a severe impairment, determination of whether any such severe impairment meets any of the impairments listed in the

regulations;[3] if the claimant does have such an impairment, the claimant is disabled and the analysis ends;[4]

4.    If the claimant's impairment is not listed, determination of whether the impairment prevents the claimant from performing his or her past work;[5] if the impairment does not, the claimant is not presumed disabled and the analysis ends; and

5.    If the impairment prevents the claimant from performing his or her past work, determination of whether the claimant can engage in other types of substantial gainful work that exist in the national economy;[6] if the claimant can, the claimant is not disabled and the analysis ends.

The claimant has the initial burden of proving the existence of a disability within the meaning of the Act. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). The claimant establishes a prima facie case of disability by showing that a physical or mental impairment prevents her from engaging in his previous occupation. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984); 20 C.F.R. §§ 404.1520(f) and 416.920(f).

In this case, claimant convinced the ALJ that she met the criteria in step one of the sequential analysis; that she has not been engaged in substantial gainful employment. (AR 24.)

At step two, the ALJ must determine if the impairment is severe. 20 C.F.R. § 404.1521. Here, the ALJ found that claimant had the severe impairment of left knee chondromalacia, status post left knee menisectomy, synovectomy and medial plica resection. (AR 25.) Claimant argues her mental

---

[3]      *See* 20 C.F.R. Part 404, Subpt. P, App. 1.

[4]      If a claimant is found to have an impairment which meets or equals one of the listed impairments, a conclusive presumption of disability applies and the claimant is entitled to benefits. *See Marcia v. Sullivan*, 900 F.2d 172, 174 (9th Cir. 1990) (citing *Williams v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987); *Key v. Heckler*, 754 F.2d 1545, 1548) (9th Cir. 1985.

[5]      At this stage of the analysis, the ALJ should consider the demands of the claimant's past work as compared with his or her present capacity. *Villa v. Heckler,* 797 F.2d 794, 797 (9th Cir. 1986) (citations omitted); 20 C.F.R. § 416.945(a).

[6]      At this stage of the analysis, the ALJ should consider the claimant's residual functional capacity and vocational factors such as age, education and past work experience. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

1  impairment is also severe.

2  <u>**Consideration of Claimant's Mental Impairment**</u>

3  Claimant alleges multiple error in the ALJ's consideration of her mental impairment.

4  **1.    ALJ Bias**

5  Claimant argues that the ALJ displayed impermissible bias. Claimant attaches to her opening

6  brief a purported partial transcript of the administrative hearing. The transcript consists of a colloquy

7  between an ALJ and a claimant's counsel. In it, the ALJ questions the reliability of mental health

8  practitioners. The ALJ purports to liken "psychiatry and psychology" with "witchcraft." Since one of

9  claimant's alleged impairments is a mental disability, she argues that the case should be remanded due

10  to the ALJ's bias.

11  On February 18, 2005, this Court, faced with a novel issue of considering a colloquy between

12  the ALJ and claimant's counsel, but which was not part of the Administrative Record filed by the

13  Commissioner, requested supplemental briefing. On March 10, 2005, the parties responded to the

14  Court's order. The Commissioner noted that the transcript was not from Wendy Edward's (this

15  claimant) administrative proceeding, but arose in different proceeding, with a different claimant, some

16  years earlier. Claimant acknowledges that the transcript did not arise in her administrative proceeding.

17  ALJs and other similar quasi-judicial administrative officers are presumed to be unbiased.

18  *Verduzco v. Apfel*, 188 F.3d 1087, 1089 (9th Cir. 1999). "This presumption can be rebutted by a showing

19  of conflict of interest or some other specific reason for disqualification." *Id.* The burden of making such

20  a showing rests with the party asserting bias. *Verduzco v. Apfel*, 188 F.3d at 1089. While " 'expressions

21  of impatience, dissatisfaction, annoyance, and even anger' " by themselves "do not establish bias,"

22  *Rollins v. Massanari*, 261 F.3d 853, 858 (9th Cir. 2001) (quoting *Liteky v. United States*, 510 U.S. 540,

23  555-56, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994)), a claimant may rebut the presumption that an ALJ

24  is unbiased if she shows that "the ALJ's behavior, in the context of the whole case, was 'so extreme as

25  to display clear inability to render fair judgment.' " *Rollins*, 261 F. 3d at 858 (ALJ held not biased; ALJ's

26  remarks occasionally exhibited sarcasm or impatience, particularly with respect to the rheumatologist's

27  reports); see also 20 C.F.R. § 404.940.

28  The threshold issue for the Court is the proper authentication of the transcript. In the Court's

February 18, 2005 order, the Court specifically requested proper authentication of the transcript. Authentication has not been provided.  In *Lowry v. Barnhart,* 329 F.3d 1019, 1024-25 (9th Cir. 2003), a Social Security case, the Ninth Circuit rejected an attempt to submit evidence on appeal that was not part of the district court record. The Court explained that it lacked "the means to authenticate documents submitted to us, so we must be able to assume that documents designated part of the record actually are part of the record." *Lowry v. Barnhart,* 329 F.3d at 1024.  Here, this Court attempted to obtain proper authentication.

Although plaintiff responded to the Court's order with a document entitled, "Authentication of Evidence," the document did not include any authentication of the transcript.  It lacked certification of the transcript or other means of proper authentication.  Claimant stated that the tape, was "transcribed by Debbie Chavez, a Notary Public," but her certification is not provided.  Morever, plaintiff stated in her response that the transcript had been "sanitized."  Exactly what was "sanitized" from the transcript was not explained.  Thus, there is no reliability that the transcript is what it purports to be.  Accordingly, the Court will not rely on it.  Therefore, claimant has not carried her burden of showing ALJ bias.[7]

## 2.    Failed to Find Mental Impairment Severe and Develop the Record

Claimant further argues that the ALJ should have developed the record as to her mental impairment.

Although the claimant bears the burden of proof where the evidence in the record is equivocal, the ALJ has a duty to assist in developing the record. *Armstrong v. Commissioner of Social Security*, 160 F.3d 587, 589-90 (9th Cir.1998); see also *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2084 (2000); 20 C.F.R. § 404.1512(a) (instructing claimant that ALJ will consider "only impairment(s) you say you have or about which we receive evidence"); *id.* §§ 404.1512(d)-(f) (detailing the ALJ's duties to develop a claimant's complete medical history before making a determination of non-disability; to obtain additional information if reports from claimant's medical sources contain ambiguities or are otherwise "inadequate

---

[7] The Court notes that a cursory review of the substance of the transcript indicates that the ALJ's statements were not as biased as claimant contends.  First, the ALJ expressed concern that the medical records lacked evidence of objective testing of the purported mental condition, even though objective testing is required under the Regulations.  In addition, the ALJ stated that the psychologist in the case offered an opinion of disability, yet did not submit, nor had any, treatment notes, even though the patient/claimant had been seen for a purported year of therapy.  This Court, however, does not reach the merits of the substance of the transcript.

1   for us to determine whether you are disabled;" and to order a consultative examination if unable to seek

2   clarification from medical sources or if "the information we need is not readily available from the

3   records of your medical treatment source").  If the ALJ determines that the treating physician's records

4   are inconclusive or otherwise inadequate to receive controlling weight, absent other medical opinion

5   evidence based on personal examination or treatment of the claimant, the ALJ must seek clarification

6   or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e).

7       At step two, the ALJ must determine if the mental impairment is severe.  20 C.F.R. § 404.1521.

8   The ALJ found that claimant did not suffer from a severe mental impairment.

9       Claimant argues that the ALJ erred by not finding her mental condition "severe." Claimant

10  argues that she was in "special education classes" (AR 107), and did not obtain a GED.

11      The Social Security regulations define severe impairment as an impairment which significantly

12  limits a claimant's "ability to do basic work activities." 20 C.F.R. §§§§ 404.1521, 416.921; *Bustamante*

13  *v. Massanari*, 262 F.3d 949, 955 (9th Cir. 2001).  "Basic work activities" are defined as including such

14  capabilities as walking/sitting/standing/lifting, 20 C.F.R. § 404.1521(b)(1),(2); understanding, carrying

15  out, and remembering simple instructions, 20 C.F.R. § 404.1521(b)(3); use of judgment, 20 C.F.R. §

16  404.1521(b)(4); responding appropriately to supervision, co-workers and usual work situations, 20

17  C.F.R. § 404.1521(b)(5); and dealing with changes in a routine work setting, 20 C.F.R. §

18  404.1521(b)(6).  If the impairment does not significantly limit a claimant's physical or mental ability

19  to do basic work activities, the impairment is not severe.  *Bustamante v. Massanari*, 262 F.3d at 955

20      The existence of a mental impairment must be established by medical evidence consisting of

21  clinical signs, symptoms and/or laboratory or psychological test findings.  20 C.F.R. §§ 404.1526(b) and

22  416.926(b); 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(B).  Signs include psychological

23  abnormalities which can be observed apart from symptoms and must be shown by medically acceptable

24  clinical diagnostic techniques.  20 C.F.R. §§ 404.1528(b) and 416.928(b).  Psychiatric signs are

25  medically demonstrable phenomena which indicate specific abnormalities of behavior, affect, thought,

26  memory, orientation and contact with reality, and which must also be shown by observable facts that can

27  be medically described and evaluated.  20 C.F.R. §§ 404.1528(b) and 416.928(b).  They are typically

28  assessed by a psychiatrist or psychologist and/or documented by psychological tests. 20 C.F.R. Part 404,

14

Subpart P, Appendix 1, § 12.00(B).

The ALJ set forth specific and legitimate reasons to reject the severity of claimant's mental limitations in full and provided a comprehensive outline of the facts and clinical evidence. First, the ALJ relied on the fact that there was a lack of mental health treatment. (AR 26.) The ALJ then reviewed the October 2000 consultative psychological evaluation. (AR 25.) One the one hand, the ALJ noted that claimant reported at the examination "wide-ranging daily activities." (AR 25.) On the other hand, he acknowledged that "[t]he IQ testing revealed very low scores that indicated a possible cognitive disorder though her pressured speech, tangential and confusion may be been due to drug usage, which the ALJ noted she "vehemently' denied." (AR 25.) The ALJ reconciled the conflicting evidence:

> "[h]er complaints of 'anxiety' are only documented with respect to court proceedings in 1998, while her apparent 'cognitive' disorder was found only during one psychological evaluation and cannot be credited in view of indications of possible drug use that may have affected her functioning. Although subsequent drug testing was negative for illicit drugs, the July 2002 laboratory tests were completed long after the October 2000 psychological evaluation. In any event, there is no longitudinal history of a severe cognitive or other severe mental disorder." (AR 25.)

Thus, the ALJ considered all of the medical notes of claimant's mental condition contained in the Record. There was no evidence in the record of a determinable mental impairment of longitudinal history.

While claimant argues that the ALJ erred in failing to develop the Record, the Record shows that the Commissioner obtained the consultative psychological examination, obtained the treatment records of all of the doctors, clinics and other treatment sources identified by claimant. (AR 103-105.) The ALJ reviewed each of the treatment records, summarized the records and the doctor's opinions. The ALJ considered and relied upon the October 2000 psychological evaluation and the review by the State agency physicians. The Commissioner obtained the consultative psychological examination by Dr. Kirkland due to the allegations of mental impairment. (AR 177-181.) Based on the unambiguous failure of proof of an impairment, there was no justification for an additional medical opinion. The ALJ fulfilled her duty to develop fully and fairly the record and to assure that claimant's interests were considered. This Court finds there was no need for the ALJ to request additional medical opinion.

Claimant argues that the ALJ should have called a medical advisor to evaluated whether Listings

1    12.05 or 12.02 were met.

2          A medical advisor is a neutral advisor who renders expert opinion based solely on medical

3    records and evidence. *See Richardson v. Perales,* 402 U.S. at 408 (1971); 20 C.F.R. §§ 404.1512(b)(6),

4    404.1527(f). A medical advisor generally is a board-certified specialist that explains or clarifies

5    information for an ALJ. *See Richardson,* 402 U.S. at 408. Under applicable regulations, an ALJ must

6    utilize a medical advisor only in certain instances when it is unclear as to whether a claimant's

7    impairments are equivalent in severity to impairments in the Listings.  An ALJ must seek the opinion

8    of a medical advisor when (1) The ALJ concludes that the claimant does not meet the specific criteria

9    outlined in *the Listings* but reasonably believes claimant's impairments may be judged equivalent or; (2)

10   If an ALJ receives additional medical evidence that (s)he believes may change the "State agency medical

11   or psychological consultant's finding that the impairment(s) is not equivalent in severity to any

12   impairments in the Listings. Social Security Ruling 96-6p.

13         It is the ALJ who "is responsible for deciding the ultimate legal question whether a listing is met

14   or equaled." SSR 96-6p. Once the ALJ concluded that the evidence was unpersuasive, he had no

15   obligation to call in another state medical expert to review that evidence.

16         **3.    Functional Limitations**

17         Claimant argues that the ALJ failed to properly adopt the numerous moderate limitations

18   assessed by the State agency phsycian in the Mental Residual Functional Capacity Assessment form.

19   (AR 190-203.)

20         Here, the ALJ adopted a limitation stating that claimant is "slightly limited in attention,

21   concentration, understanding and remembering."  (AR 26.)  Dr. Yancha assessed "not significantly

22   limited" in various areas and "moderately limited" in other areas.  It is the ALJ's duty to resolve

23   conflicting medical evidence. *Benton ex rel. Benton v. Barnhart,* 331 F.3d 1030, 1040 (9th Cir. 2003)

24   (Where, as here, the record contains conflicting medical evidence, the ALJ is charged with determining

25   credibility and resolving the conflict.)  If there is substantial evidence to support the administrative

26   findings, or if there is conflicting evidence that will support a finding of either disability or nondisability,

27   the finding of the Commissioner is conclusive.  *Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir.

28   1987).  The Court does not find error.

1      **4.      Substantial Evidence to Support ALJ**

2          The claimant argus the ALJ's decision provides insufficient rationale to support his finding that

3      claimant's mental impairment is not severe.

4          As shown above, there is substantial evidence in the record to support the ALJ's finding that the

5      mental condition is not severe.

6                **Claimant's Residual Functional Capacity and Treating Physicians**

7          The ALJ found that claimant was capable of performing modified sedentary work.  (AR 26.)

8          The Commissioner has final responsibility to determine a claimant's residual functional capacity.

9      20 C.F.R. § 404.1546.  "Residual functional capacity" is the phrase used by the Commissioner to denote

10     a claimant's ability to perform work-related tasks despite his physical or mental impairments.  20 C.F.R.

11     §§ 404.1545(a) and 416.945(a).  Categories of residual functional capacity include sedentary, light,

12     medium, heavy and very heavy work.  20 C.F.R. §§ 404.1567 and 416.967.  In this case, the ALJ found

13     that claimant had the residual functional capacity for modified sedentary work.  Sedentary work involves

14     lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files,

15     ledgers and small tools.  Although a sedentary job is defined as one which involves sitting, a certain

16     amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if

17     walking and standing are required occasionally and other sedentary criteria are met.  20 C.F.R. §§

18     404.1567(a) and 416.967(a).

19         Claimant contends that she is unable to perform sedentary work on a full time basis.  Claimant

20     argues that the ALJ erred in rejecting the limitations imposed by her treating physician, Dr. Gupta.

21         Generally, more weight should be given to the opinion of a treating source than to the opinion

22     of doctors who do not treat the claimant.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  The Ninth

23     Circuit has held that a treating physician's opinion is generally to be afforded great weight in disability

24     cases because he or she ". . . is employed to cure and has a greater opportunity to know and observe the

25     patient as an individual."  *Sprague v. Bowen*, 812 F.2d at 1230; *see also* 20 C.F.R. §§ 404.1527(d) and

26     416.927(d).  However, a treating physician's opinion is not conclusive as to a claimant's physical

27     condition or the ultimate issue of disability and may be disregarded by the ALJ even where it is not

28     contradicted.  20 C.F.R. § 404.1527(e); *Rodriquez v. Bowen*, 876 F.2d 759, 761-762, n. 7 (9th Cir. 1989).

1    The Ninth Circuit Court of Appeals has established requirements when an ALJ disregards the

2  treating physician's opinion:

3    "The ALJ may disregard the treating physician's opinion, but only by
     setting forth "specific, legitimate reasons for doing so, and this decision
4    must itself be based on substantial evidence." This burden can be met by
     providing a detailed summary of the facts and conflicting clinical
5    evidence, along with a reasoned interpretation thereof. *Id.* Furthermore,
     the ALJ's reasons for rejecting the doctor's opinion must be "clear and
6    convincing."

7  *Rodriquez,* 876 F.2d at 762.  This burden can be met by providing a detailed summary of the facts and

8  conflicting clinical evidence, along with a reasoned interpretation thereof.  *Cotton v. Bowen*, 799 F.2d

9  1403, 1408 (9th Cir. 1986); *but see Allen v. Heckler*, 749 F.2d 577, 579-80 (9th Cir.1984) (articulating

10  a narrow exception; where there is a conflict between the findings of the treating and non-treating

11  physicians, and the non-treating physician's opinion is based on a thorough examination and objective

12  clinical tests, findings by the ALJ that the plaintiff is not disabled will be considered supported by

13  substantial evidence).

14    A statement by a physician indicating a claimant is "disabled" does not mean that the Secretary

15  will concur, absent review of medical findings and other evidence. 20 C.F.R. §416.928. Claimant bears

16  the burden of proving that he is disabled by presentation of "complete and detailed objective medical

17  reports of h[is] condition from [a] licensed medical professional." *Meanel v. Apfel*, 172 F.3d 1111, 1113

18  (9th Cir. 1999) (citing 20 C.F.R. 404.1512(a)-(b), 404.1513(d)).

19    Dr. Gupta opined that claimant was disabled due to stroke.  (AR 243.)  The ALJ, however,

20  properly determined that she did not have an impairment.  The ALJ noted that the claimant complained

21  of having had a "stroke:"

22    "The medical records indicate the claimant complained of having
     episodic left-sided weakness beginning in 1997 and variously diagnosed
23    as a 'stroke,' 'slight stroke,' and tangent ischemic attacks." (AR 24.)

24  He noted the impairment due to stroke was not corroborated by medical testing:

25    "Regarding her alleged "strokes" or similar episodes, the various
     diagnostic studies have failed to demonstrate abnormal findings that
26    would account for such complaints." (AR 25.)

27  /////

28  /////

18

The ALJ reviewed the medical records which let him to this conclusion.

> "However, various clinical and laboratory studies, including a March 1998 brain, were reported as normal." (AR 24.)

> "Also in August 2001 she presented to a county neurology clinic for complaints of increasing left-sided weakness and numbness and episodic loss of consciousness with subsequent confusion and dizziness. Though the clinical exam revealed some left-sided weakness, carotid Doppler, CT brain scan and electroencephalogram were normal." (AR 25.)

The ALJ noted that her treating physician Dr. Kassa refused to refer her for a neurological evaluation. (AR 26.) In short, there was no objective evidence that claimant suffered from a stroke. And thus, Dr. Gupta's opinion was not credited. An ALJ may reject a treating physician's opinion whether or not it is contradicted, if the opinion is "brief and conclusory in form with little in the way of clinical findings to support its conclusion." *Magallanes v Bowen,* 881 F.2d 747, 751 (9th Cir. 1989).

The ALJ relied upon the consultative internal medicine examination by Dr. Jones in assessing claimant's residual functional capacity. (AR 25.) "The current exam showed pain with passive range of left knee motion but otherwise gait, reflexes and motor strength were normal except for a 4/5 left grip that the examiner believed was due to poor effort." (AR 25.) Dr. Jones found that the stroke dubious and not evident. (AR 169.) The ALJ however, gave claimant the benefit of the doubt on left-sided weakness:

> "There is no objective medical evidence to support her assertions that she has suffered a 'stroke' or similar neurological deficit, though in view of some evidence of equivocal left-sided weakness the undersigned will give her the benefit of a moderate limitation in her capacity for left-hand manipulation." (AR 26.)

Contrary, to claimant's argument, the ALJ did not reject Dr. Kassa's January 2002 assessment. The ALJ rejected only the limitation on standing:

> "[T]here is no dispute that she has a significant left knee impairment and because of which she would be restricted to sedentary work activity. In making this assessment, the undersigned has taken into account Dr. Kassa's January 2002 assessment, in which he reports the claimant's left sided upper and lower extremity weakness and restricts her to a fairly wide range of sedentary exertion, thought his statement that she can sit for 6 hours but only stand/walk for a total of one hour during an 8 hours workday would appear to somewhat less that full time sedentary work because it amounts to less than 8 hours." (AR 27.)

1   The ALJ found that limitation on standing/walking was not supported by the record. The ALJ noted that

2   extensive activities of daily activities engaged in by claimant:

3           "She described her daily activities as consisting of preparing meals 4
            times a day, washing dishes 5 times a day, mopping floors 8 times a
4           month, sweeping/vacuuming 7 times a week, dusting twice a week, doing
            laundry once a week, shopping once a week, making the bed daily and
5           changing the bedding once a week, watching TV four hours and reading
            two hours a day, visiting with others three times a week and spending the
6           rest of the day laying down and walking. She goes to the park and waters
            the grass." (AR 26.)

7

8   He noted that for exercise she rides a bike and uses weights. (AR 26.)  Wide-ranging daily activities are

9   an appropriate consideration for a finding of residual functional capacity.  There is substantial evidence

10  in the record to support the ALJ's finding that claimant can perform sedentary work.

11          The claimant argues that the ALJ failed to fully consider her postural limitations of needing to

12  elevate her leg and the need for a cane.

13          The ALJ considered that claimant was not referred for an orthopedic evaluation, and that

14  claimant did not use a cane or assistive device at the hearing.  In addition, the ALJ considered the knee

15  injury "for which she has undergone corrective surgery and physical therapy.  She has been seen for

16  some pain and swelling but otherwise the medical signs and findings have been quite minimal."  (AR

17  26.)

18          Claimant argues that she had another knee surgery, after the date of the administrative decision.

19  (AR 372.)  The evidence submitted shows, at most, a deterioration of plaintiff's left leg impairment.

20  Implicit in the materiality requirement is that the new evidence relate to the time period for which

21  benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent

22  deterioration of the previously non-disabling condition.  *Ward v. Schweiker*, 686 F.2d 762, 765-66 (9th

23  Cir.1982).  In *Ward v. Schweiker*, the Ninth Circuit held that new evidence indicating medical

24  deterioration does not necessarily establish a "reasonable possibility" that such evidence would have

25  changed the outcome of the prior decision.

26          Claimant argues that the ALJ failed to consider her complaints of "lumbar strain." Claimant cites

27  to evidence incorrectly included in the Record for a different patient of Dr. Gupta. (AR 144, 246, 251.)

28  In short, the medical records are not claimant's records.  Moreover, the ALJ noted that claimant only had

1  minimal treatment for back strain with no apparent follow up.  (AR 25-26.)  He noted that Dr. Kassa

2  refused to refer her for an orthopedic evaluation.  (AR 26.)  The Court does not find error.

3      Claimant argues that the ALJ failed to consider her "migraines."  Claimant cites to two treatment

4  notes from 1998, and 1999.  (AR 250, 253.)  Claimant does not argue how these notes satisfy her burden

5  under 42 U.S.C. § 1382c (a)(3)(A).

6                                      **Claimant's Subjective Complaints**

7      Claimant argues that the ALJ did not fully and fairly evaluate her testimony.  He extracted

8  testimony, despite a lengthy hearing and was not specific.

9      A claimant's credibility generally becomes important at the stage where the ALJ is assessing

10  residual functional capacity, because the claimant's subjective statements may tell of greater limitations

11  than can medical evidence alone. Social Security Rule (SSR) 96-7p (1996); *Tonapetyan v. Halter*, 242

12  F.3d 1144, 1147 (9th Cir. 2001). For this reason, the ALJ may not reject the claimant's statements

13  regarding his limitations merely because they are not supported by objective evidence. *Fair v. Bowen*,

14  885 F.2d 597, 602 (9th Cir.1989).  In assessing the claimant's credibility, the ALJ may use "ordinary

15  techniques of credibility evaluation," such as considering the claimant's reputation for truthfulness and

16  any inconsistent statements in her testimony.  *Tonapetyan v. Halter*, 242 F.3d at 1148.  The ALJ must

17  give specific, convincing reasons for rejecting the claimant's subjective statements. *Fair v. Bowen*, 885

18  F.2d at 602; *Tonapetyan v. Halter*, 242 F.3d at 1148.  An ALJ may consider the following factors to

19  determine the credibility of a claimant's allegations of disabling pain:

20      (1)    The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

21      (2)    Precipitating and aggravating factors (e.g., movement, activity, environmental

22  conditions);

23      (3)    Type, dosage, effectiveness, and adverse side-effects of any pain medication;

24      (4)    Treatment, other than medication, for relief of pain;

25      (5)    Functional restrictions;

26      (6)    Claimant's daily activities;

27      (7)    Unexplained, or inadequately explained, failure to seek treatment or follow up a

28  prescribed course of treatment; and

1    (8)    Ordinary techniques to test a claimant's credibility.

2  *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991).

3        The ALJ partially accepted and partially rejected claimant's testimony:

4            "The undersigned is unable to entirely credit the claimant's testimony,
             particularly her statement that she can only sit for 30 minutes or
5            otherwise perform the demands of a wide range of 'sedentary' exertion."
             (AR 26.)
6

7  The ALJ had concluded a recitation of claimant's extensive activities of daily living - active household

8  chores and watching TV for 4 hours a day and reading for 2 hours a day - did not corroborate her

9  extreme limitations.

10       The ALJ also noted that her complaints, particularly regarding a stroke, were inconsistent with

11  the objective medical evidence.   (AR 26.)  While subjective pain testimony cannot be rejected on the

12  sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still

13  a relevant factor in determining the severity of the claimant's pain and its disabling effects. *Rollins v.*

14  *Massanari*, 261 F.3d at 857.

15       The ALJ accepted some mental impairment "of slightly limited in attention, concentration,

16  understanding and remembering," even thought claimant had a sparse history of mental treatment.  (AR

17  26.)  He credited her with a slight impairment because she tended to ramble and exaggerate at the

18  hearing.

19       Moreover, the ALJ considered claimant's appearance at the hearing ("without a cane or other

20  assistive devices"), he considered her medical records, her statement and her testimony.  The record

21  supports a partial discrediting of claimant's testimony.  "Credibility determinations are the province of

22  the ALJ." *Fair v. Bowen*, 885 F.2d at 604.  Thus, there is substantial evidence in the record to support

23  the ALJ's partial rejection of plaintiff's subjective complaints.

24       Claimant also argues that the ALJ's analysis of claimant's testimony is "indefensible" under

25  Social Security Ruling 96-7p.  Claimant does not further argue the point.  The only error argued is the

26  purported brevity of the ALJ's analysis.  The Court will not speculate on what claimant may consider

27  error by the ALJ.

28  /////

1

## CONCLUSION

2        The Court finds no error in the ALJ's analysis.  As such, the ALJ's decision is supported by

3   substantial evidence in the record as a whole and based on proper legal standards.  Accordingly, this

4   Court DENIES claimant's appeal from the administrative decision of the Commissioner of Social

5   Security.  The clerk of this Court is DIRECTED to enter judgment as a matter law in favor of defendant

6   Jo Anne B. Barnhart, Commissioner of Social Security and against claimant Wendy Edwards.

7   IT IS SO ORDERED.

8   **Dated:    April 22, 2005**                      **/s/ Lawrence J. O'Neill**
    b9ed48                                      UNITED STATES MAGISTRATE JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28